USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT ____________________ No. 96-2213 ROBERTO TIRADO-ACOSTA, ET AL., Plaintiffs, Appellants, v. PUERTO RICO NATIONAL GUARD, ET AL., Defendants, Appellees. ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF PUERTO RICO [Hon. Carmen C. Cerezo, U.S. District Judge] ____________________ Before Selya, Circuit Judge, Cyr, Senior Circuit Judge, and Boudin, Circuit Judge. ____________________ Rafael F. Castro Lang with whom F. Castro Amy was on brief for appellants. Sylvia Roger Stefani, Assistant Solicitor General, Department of Justice,  with  whom  Carlos Lugo Fiol, Solicitor General, and Edda Serrano Blasini, Deputy Solicitor General, were on brief for appellees. ____________________ July 9, 1997 ____________________ BOUDIN, Circuit Judge. Plaintiffs in this action, all members of the Puerto Rico National Guard, were called to active  duty  in the Persian Gulf War. Prior to active duty and briefly upon their return, they were employed full-time in a National Guard program to assist in drug interdiction. Not long after their return, the plaintiffs' assignment to this program  was  terminated  by the Puerto Rico National Guard. When the  plaintiffs sued, the district court ruled that they had no statutory  right to reemployment in such a program. We affirm. The basic facts are not in dispute. The Puerto Rico National Guard, like the National Guards in all 50 states, is a hybrid organization. National Guards are ordinarily under the control of state (or, in the case of Puerto Rico, Commonwealth) officials, but are organized pursuant to federal statute,  and  in war time or other emergencies, Guard units may be brought under federal control. See U.S. Const., art. I, sec. 8, cl. 16; 32 U.S.C. S 101, et seq. In  1989,  Congress  authorized federal funding to permit the local National Guards to support drug interdiction and other counter-drug activities. 32 U.S.C. S 112. Section 112 provided  that each state desiring to participate would draw up its own plan subject to approval by the Secretary of Defense. Despite this and other authority over the program granted to the Secretary of Defense, the statute required that the National  Guard personnel involved in these operations be under -2- -2- local  control and "not in Federal service," id. S 112(c)(1), a requirement apparently designed to mesh with the Posse Comitatus Act, 18 U.S.C. S 1385, limiting the use of federal troops for domestic law enforcement purposes. Most National Guard members ordinarily serve only part time, but there are exceptions. Section 112 itself provided that subject to Secretary of Defense regulations, local National Guard members could, pursuant to a state plan, "be ordered  to  perform full-time National Guard duty under section 502(f) of this title for the purpose of carrying out drug interdiction  and counter-drug activities." 32 U.S.C. S 502(f) allows National Guard personnel to be assigned additional duties, apart from ordinary drills and field exercises, with the provision appropriate for "pay and allowances." Beginning  in  1989,  the  Puerto Rico National Guard used the federal funds provided under section 112 for a variety of counter-drug projects. In one of the projects, Puerto Rico National Guard personnel assisted the U.S. Customs Service in inspecting cargo containers arriving and leaving Puerto Rico ports and airports. Each of the plaintiffs in this case is a Puerto Rico National Guard member who was assigned to work full-time in 1989 to 1990 in this phase of the counter-drug program. Minor variations aside, each plaintiff worked under orders couched in the following terms: You are ordered to Active Duty special work (ADSW) for the period indicated plus -3- -3- allowable  travel time. Upon completion of the period of ADSW unless sooner relieved or extended by proper authority you will return  to  the place where you entered ADSW and are relieved from such duty. According to the memorandum of understanding between the Puerto Rico National Guard and the Customs Service, "National Guard personnel employed in support of [the Customs Service] for counter-drug operations will be under the command of, and directly  responsible to their military chain of command." The memorandum also said that "all missions will be executed through  the  military  chain of command; i.e., tactical direction of the troops . . . will be left solely to the National Guard Officers in Charge/Noncommissioned Officer in Charge." Thus, the plaintiffs working in the drug interdiction program  were  ultimately  commanded and controlled by Puerto Rico National Guard officers, and they were paid for their work by the Puerto Rico National Guard from funds provided by the federal government. However, much of the plaintiffs' day-to- day work was directed by Customs Service officials. The work itself  did  not  entail  the use of any specialized military skill but consisted mainly of unloading and reloading cargo containers or inspecting their contents. The  plaintiffs' pay and allowances for full-time National Guard duty in the program were substantial (e.g., $1,400 to $2,000 per month). Each plaintiff worked under orders assigning  him such duty for a relatively brief period, ranging -4- -4- from  2  days  to 61 days, but the orders were regularly renewed. At  trial  the  plaintiffs  testified that they believed that these orders  would  be  renewed  indefinitely so long as funding for the drug interdiction program continued. They said that they had been given assurances that they would not be dismissed unless they failed to perform their work satisfactorily. In January 1991, all of the plaintiffs were called into active service on account of the Persian Gulf War and left their positions in the drug interdiction program. The plaintiffs completed their active federal military duty in early  July  1991  and  were  reassigned by the Puerto Rico National Guard  to  the  drug interdiction program for the period July 11, 1991  to  September  30,  1991. On October 1, 1991, the plaintiffs were released from full-time duty in the program, and their positions taken by other Guard personnel. In  September  1992, the plaintiffs brought suit in federal district court in Puerto Rico seeking reinstatement and back pay. The principal claim brought against the Puerto Rico National Guard "and/or the United States of America" was that defendants had violated the plaintiffs' rights under the Veterans' Reemployment Rights Act ("the Veterans' Act"), then codified  at  38 U.S.C. S 2021 et seq., by not retaining them in their full-time drug-interdiction positions following their -5- -5- return from the Gulf War. The United States was later dismissed as a defendant.1  The Puerto Rico National Guard moved to dismiss the complaint on several grounds, including failure to state a claim, non-justiciability, Eleventh Amendment immunity, non- exhaustion of administrative remedies, and untimeliness. The district  court deemed most of these defenses lacking in merit; and it said that the merits could not be resolved without developing  a  factual  record. Accordingly, after discovery, the district  court  conducted  a bench trial in August 1995 and heard testimony from both sides.  In  a  written  decision  issued August 16, 1996, the district court dismissed the complaint. It ruled that the plaintiffs did not have reemployment rights under the Veterans' Act because their drug interdiction positions were "military in nature" and therefore beyond the statute's intended coverage; the  court  did not reach or resolve the defendants' alternative statutory  defense  that  the plaintiffs be excluded from coverage because  their  posts  were  "temporary." See 38 U.S.C. S 2021(a). The district court entered judgment for the defendants, and this appeal followed.  1The complaint also alleged that two individual Guard officers had violated 42 U.S.C. S 1983 by refusing to retain the plaintiffs in the program; but this claim was contingent on a showing of violation of the Veterans' Act and requires no further discussion. -6- -6- In our view, the district court was clearly right in its construction of the federal statute, and we affirm on that ground without addressing other defenses. Where the result would  be  the  same, this court has often rejected claims on the merits without resolving possible jurisdictional objections. Hachikian  v.  FDIC ,  96  F.3d 502, 506 n.4 (1st Cir. 1996). Here, the case ought to be decided promptly, in view of the delay already  suffered by the plaintiffs, and the legal issue is one that can be decided definitively only by a federal court.  We begin with the terms of the Veterans' Act. This statute, enacted in 1978, carried forward the policy that Congress  first  adopted  in 1940 to provide employment protection for veterans returning from military service. Monroe v. Standard Oil Co., 452 U.S. 549, 554-55 (1981). Although the Veterans' Act has itself been superseded by a new enactment-- the  Uniform  Services  Employment and Reemployment Act, 38 U.S.C. S 4301 et seq.--the new statute applies only to reemployments initiated on or after October 13, 1994. 110 Stat. 3336. The Veterans' Act main section granting reemployment rights is 38 U.S.C. S 2021, which provides protection for anyone "inducted into the Armed Forces of the United States" under the selective service statute. A companion section, 28 U.S.C. S 2024, extends similar protection, by cross-reference back to section 2021, to several other classes of persons including reservists and others called to "active duty (other -7- -7- than  for  the  purpose of determining physical fitness and other than for training) . . . ." Concededly, the plaintiffs were called to active duty in 1991. Section 2021(a) provides that an inductee (or by cross- reference a reservist called to active duty) "who leaves a position  (other  than  a  temporary position) in the employ of any employer"  is  entitled to reemployment if sought within 90 days after release from the military. The conditions and obligations vary somewhat depending on whether the prior employer was governmental or private, but it is common ground that the statute protects prior employment by the federal government, the states, and the Commonwealth of Puerto Rico. See 38 U.S.C. S 2021(a); id. S 101(20) (defining the Commonwealth as a state for this purpose). Although  the  Veterans' Act covers "a position (other than a temporary position) in the employ of any employer," the defendants argue that the statute was not meant to protect prior employment in a military position. We consider at the outset whether the statute, which contains no such limiting term,  should  be  so  construed; and, finding that it should be so read, we then return to the question whether the plaintiffs' former positions in the drug interdiction program should be regarded as unprotected military positions. Both are legal questions, but of slightly different character.  -8- -8- As we have noted, no express term in the Veterans' Act limits a protectible former "position" to a position in civilian employment or excludes from the category of protectible  positions a military assignment. Nevertheless, it is  apparent  to  us  that  the statute must be thus construed. The evidence for this conclusion is provided by the structure and purpose of the statute, by extrinsic policy safeguarding the autonomy of military organizations, and by the lack of precedent extending reemployment protection to military positions. First, the very design of the Veterans' Act makes clear its central aim was to protect those who were inducted or otherwise drawn into military life and thereby required to surrender  their  civilian  jobs. The Supreme Court, for example, has spoken of the Veterans' Act as relating to "military service after which a member of the Armed Forces retains the right to civilian employment." King v. St. Vincent's Hosp., 502  U.S.  215,  216  (1991). Congress probably did not insert the word "civilian" before "position" simply because it seemed unnecessary to add a term made almost redundant by context.  Each of the provisions providing reemployment protection is  directed  at  persons  who cross the barrier from civilian into military life: the inductee (section 2021), the enlistee (section 2024(a)), the reservist entering upon active duty (other than for physical fitness testing or for training) -9- -9- (section 2024(b)), and certain persons who enter upon active duty for training or inactive duty training (subsections (c) and  (d)).   It  is  persons  who leave "a position" to perform such duties and thereafter seek to "be restored to such position" who are protected. 38 U.S.C. S 2021(a). There is simply no hint in all this that when Congress sought to protect prior employment, it intended to protect prior employment in a military capacity. It is true that civilian  employees of state and federal military organizations are  themselves  protected  if called to active duty. See Panigua v. Department of the Air Force, 13 M.S.P.R. 306, 307-09 (M.S.P.B. 1982). But such civilian employees of the military are akin to civilian employees of any other department of government. Military employees are a different matter. This brings us to a further, reenforcing reason why we decline to read the Veterans' Act to protect reemployment rights  in  former  military positions. The courts have long been reluctant to interfere with internal military decisionmaking, including  personnel decisions. With only rare exceptions, the courts  have  taken  the  view that assignments within the military structure  are matters to be decided by the military and not by the courts. See Orloff v. Willoughby, 345 U.S. 83, 93-94 (1953). The reasons are too obvious to need elaboration. In some situations, this view is expressed by deeming a controversy to be nonjusticiable, Wright v. Park, 5 F.3d 586, -10- -10- 589-91  (1st  Cir. 1993); in others, it takes the form of giving great deference to the military's judgment on the matter at hand. Richenberg v. Perry, 97 F.3d 256, 261 (8th Cir. 1996). But the underlying notion is that matters of military organization, personnel and operations are extremely sensitive and that courts will do more harm than good by interfering.  Congress  can  provide otherwise by statute, but rarely does so. Thus, we conclude that Veterans' Act protections do not extend to affording anyone reemployment rights in a military position. However generously the Veterans' Act may be construed to protect prior civilian employment, Tilton v. Missouri P.R.R., 376 U.S. 169, 181 (1964), Congress did not intend  that  anyone  should have a preemptive claim to his former position as an air force pilot or an army tank commander. Whether the plaintiffs' positions in the Puerto Rico National Guard  drug  interdiction program should be viewed as sharing in this  "military" character is a different issue to which we now turn. It  is  clear  from section 112 and the orders issued to the plaintiffs that their participation in the drug interdiction program  was  the  performance of "full-time National Guard duty." The  drug  interdiction  statute, 32 U.S.C. S 112(b), provides for Guard personnel to perform such National Guard duty "under section 502(f)" to carry out drug interdiction; and section 502(f)  allows Guard members to be ordered to perform "training -11- -11- or other duty" in addition to assembly for drills and encampment.   The  orders  issued to the plaintiffs made reference to section 502(f) and, in certain cases, section 503 which is a companion provision involving joint exercises with the army or the air force. In addition, the evidence shows that the plaintiffs were participating in the drug interdiction program pursuant to military  orders and were subject to the command and control of Guard  officers.   Indeed,  it appears likely that the plaintiffs' full-time  positions  in  the drug interdiction program might have allowed  them  to claim reemployment rights in any civilian jobs they  held  at  the  time  they entered upon full-time duty. See 38 U.S.C. S 2024(c)(d); id. S 101(22)(C). In all events, full- time National Guard duty by a Guard member under military orders appears to us quintessentially military in character.  It  is  quite  true that the physical tasks performed by the plaintiffs could have been, and commonly were, performed by customs  officers  who  were not in military service. But this is common: one can be a cook or a pilot or a radio operator in either military or civilian life. National Guard members called to duty to build up the dikes in a flooded area are still part of the military even though they are engaged in construction work. Given Congress' intent to protect prior civilian jobs for those serving in the military, it is the nature  of  the employment--not its functions--that is decisive. -12- -12- The same result follows from extrinsic policy. It would directly offend the tradition of non-interference in military assignments for a court to direct that the plaintiffs be restored to performing specific functions as National Guard members assigned to full-time duty in the drug interdiction program. The Puerto Rico National Guard cited as reasons for its reshuffling of personnel "unity of command" and "rank." The  plaintiffs  say  that  these objectives could have been met by a  different  reorganization that retained their jobs; but making these evaluations is just what courts are reluctant to do. It remains to refer briefly to cases involving Guard employees governed by the National Guard Technicians Act of 1968, 32 U.S.C. S 709. These technicians are "full-time civilian  employees  of  the National Guard" who are also, in most cases, required to hold "concurrent National Guard membership as a condition for their civilian employment." H.R. Rep. No. 90-1823, at 2 (1968). E.g., Wright, 5 F.3d at 587 (full-time aircraft maintenance specialist). In  a  number  of  cases,  a  National Guard technician has been called to active service and forced to surrender his civilian technician duties with the Guard. The question has arisen whether this technician position is protected under the Veterans'  Act  after  active duty ends. One district court ruled in  favor  of  coverage, although it assumed rather than analyzed the statutory-coverage issue, and several other courts have -13- -13- been willing to assume such coverage in denying th technician's reemployment protection on other grounds.2 H arguendo e ow  this  court  would  decide such a case is unclear. There is language in Wright v. Park that would lean against protection, although the rights claimed by the technician in that  case  were not under the Veterans' Act but under the Civil Rights  Act,  42 U.S.C. SS 1983, 1985, and the federal and state whistle-blower statutes. On the other hand, a passing reference in the new reemployment statute that has supplanted the Veterans' Act may give some support to National Guard technicians who claim reemployment protection. See 38 U.S.C. S 4304(4)(B); see also H.R. Rep. No. 103-65, at 21 (1994). However such cases might be decided, we think that National Guard technicians are clearly distinguishable from the plaintiffs in this case.  National Guard technicians are employed full-time by the Guard in a civilian capacity. In this respect, they are arguably protected under the Veterans' Act like any other civilian  employees  of  a  federal or state military organization. The difficulty, where such civilian positions are tied to membership in the National Guard, is that reinstatement would require either that the military tie-in be waived or that a 2See Witter v. Pennsylvania Nat'l Guard, 462 F. Supp. 299, 305-06 (E.D. Pa. 1978); see also Polos v. United States, 621 F.2d 385, 389-90 (Ct. Cl. 1980); Leistiko v. Secretary of Army, 922 F. Supp. 66, 76 (N.D. Ohio 1996). -14- -14- military position also be made available. The issue was avoided in Witter because plaintiff in that case no longer sought reemployment but merely monetary compensation. 462 F. Supp. at 306. In  any  event, the plaintiffs in the present case were not employed  as  technicians with the curious dual capacity of that position: full-time civilian employment with an adjunct military role. The plaintiffs' only status was as "full-time National Guard" members assigned, under a state plan approved by the Secretary of Defense, to work under military orders in the drug interdiction program. Even assuming that this court might  follow  Witter  and  extend protection to technicians--which is far from clear--this would not affect our decision in the present case that the plaintiffs are not protected by the Veterans' Act. To  this  point, we have said little about the new federal statute  which, as of October 1994, supplants the Veterans' Act and provides a new framework for reemployment rights of veterans.   This new statute does not apply to the present case and is not direct evidence of the intent of the Congress that enacted the Veterans' Act. But the new statute is in certain respects  a  reenactment  of the Veterans' Act in somewhat clearer language,  and  it  would  certainly be deserving of mention if the new  version  were  strongly favorable either to the plaintiffs or the defendants. -15- -15- The  fact  is  that the new statute carries forward the same ambiguity  in  literal language that afflicts the Veterans' Act. It protects, subject to certain conditions, "any person whose absence  from  a  position  of employment is necessitated by reason of service in the uniformed services . . . ." About the most to be said is that the new statute provides that "full-time National  Guard duty" is included in the definition of "service in the uniformed services," 38 U.S.C. S 4303(13), reenforcing our view that the plaintiffs here passed over to the military domain  when  they  accepted full-time National Guard duty as part of the drug interdiction program. Affirmed. -16- -16-